IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | |
|---|---|
| LEAGUE OF WILDERNESS DEFENDERS – BLUE MOUNTAIN BIODIVERSITY PROJECT, | CV. 04-405-AS |
| Plaintiff, | OPINION AND ORDER |

v.

DALE BOSWORTH, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture,

                Defendants,

    and

SISTERS FOREST PLANNING COMMITTEE, an Oregon non-profit corporation; and FRIENDS OF THE METOLIUS, an Oregon non-profit corporation,

                Intervenor-Defendants.

ASHMANSKAS, Magistrate Judge:

Page 1 – OPINION AND ORDER

Plaintiff League of Wilderness Defenders – Blue Mountain Biodiversity Project (LOWD) brings this action alleging that defendants Dale Bosworth and the United States Forest Service (together "Forest Service") violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.,* and the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.,* in developing and approving the Final Environmental Impact Statement for the Metolius Basin Forest Management Project (Metolius Project) on the Sisters Range District of the Deschutes National Forest. The matters now before the court are LOWD's Motion for Summary Judgment and Injunctive Relief (No. 35) and the Forest Service's Motion for Summary Judgment (No. 51). Intervenor-Defendants Sisters Forest Planning Committee and Friends of the Metolius have each filed memoranda in opposition to LOWD's Motion.

For the reasons that follow, LOWD's Motion for Summary Judgment is denied**,** and the Forest Service's Motion for Summary Judgment is granted.

## BACKGROUND

The Forest Service issued a Final Environmental Impact Statement (EIS) and Record of Decision (ROD) for the Metolius Project on July 2, 2003. On September 1, 2003, LOWD filed an administrative appeal of the Acting Supervisor's decision to approve the Metolius Project. LOWD's appeal was denied on October 17, 2003.

LOWD then filed this action for judicial review of the Forest Service's final agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq.* 5 U.S.C. § 702. LOWD alleges the Forest Service violated NEPA by: (1) failing to provide data or scientific support for the proposal to reduce stand density in order to reduce the risk of wildfire and failing to consider credible science that runs counter to that proposal; (2) failing to address the Metolius

Project, Cache Mountain and Eyerly wildfires, the Eyerly Fire Salvage Project, and the McCache Vegetation Management Project in the same EIS; and (3) failing to address significant new information, specifically the 2003 Link and B&B complex wildfires, in a supplemental EIS. LOWD also alleges that the Forest Service violated NFMA by: (1) failing to analyze and discuss the impact on management indicator species; (2) failing to provide for the viability of management indicator species; and (3) failing to comply with soil standards set forth in the Deschutes National Forest Land Resource Management Plan (LRMP).

LOWD seeks a declaratory judgment that the Metolius EIS violates NEPA and NFMA and an injunction on the "commercial portions" of the Metolius Project, "including advertising, offering for sale, or awarding contracts for the commercial portions of the sale."  Complaint at ¶ F.

## STANDING

In order to have standing under Article III of the Constitution, a plaintiff must satisfy a three-part test: (1) "the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) "there must be a causal connection between the injury and the conduct complained of;" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992) (citations omitted).

Where, as here, plaintiff is an organization, plaintiff must show that: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests at stake are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit."  Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-181 (2000).

"The party invoking jurisdiction bears the burden of establishing these elements."  Lujan, 504 U.S. at 561.  At the summary judgment stage, plaintiff may not rely on allegations in the complaint, but must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.  Id. (citations omitted).  If the facts are controverted, plaintiff must establish the truth of those facts or other adequate allegations.  Id. (citation omitted); Legal Aid Soc. of Alameda County v. Brennan, 608 F.2d 1319, 1333 n. 26 (9th Cir. 1979) ("To invoke federal jurisdiction, plaintiffs must allege facts adequate to confer standing; to obtain a judgment and remedy, plaintiffs must establish the truth of these or other adequate allegations.").

LOWD does not meet the requirements for standing because LOWD has failed to establish that any of its members have suffered an injury in fact.

In Lujan, environmental organizations challenged a Bureau of Land Management regulation. The Supreme Court held that the plaintiffs did not have standing because the affidavits submitted by plaintiffs' members failed to establish that they would be directly affected by the challenged agency action apart from their special interest in their respective organizations. 504 U.S. at 563-64. The Court stated that the injury in fact test requires that the party seeking review must have suffered an individual injury:

> "Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing. But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured. To survive the Secretary's summary judgment motion, respondents had to submit affidavits or

> other evidence showing, through specific facts, not only that listed
> species were in fact being threatened by funded activities abroad,
> but also that one or more of respondents' members would thereby
> be directly affected apart from their special interest in th[e]
> subject."

Id. at 563 (internal quotations omitted).

In Laidlaw, the plaintiffs satisfied the injury in fact requirement by offering affidavits and deposition testimony from five members, each stating with specificity that the member lived near the affected area, the member had used the affected area for recreational purposes in the past, and the member's use and enjoyment of the affected area was impacted by the challenged government action. 528 U.S. at 181-182. For example, one member averred and testified,

> "that he lived a half-mile from Laidlaw's facility; that he
> occasionally drove over the North Tyger River, and that it looked
> and smelled polluted; and that he would like to fish, camp, swim,
> and picnic in and near the river between 3 and 15 miles
> downstream from the facility, as he did when he was a teenager,
> but would not do so because he was concerned that the water was
> polluted by Laidlaw's discharges."

Id. at 181-82.

LOWD has presented a declaration by Karen Coulter, the Co-Director of the Blue Mountains Biodiversity Project. In her declaration, Coulter states that: (1) she has spent time hiking and recreating in the Metolius Project area; (2) she appreciates the old growth trees and high quality riparian areas; and (3) she is concerned about the impact of the Metolius Project on old growth habitat, larger trees, water quality, and Peck's Penstemon in the Metolius Basin. This type of averment does not satisfy the injury in fact requirement. Coulter's declaration establishes her concern for the environmental consequences of defendant's actions, but fails to establish that she would be directly affected. "The relevant showing for purposes of Article III standing...is not

injury to the environment but injury to the plaintiff." Laidlaw, 528 U.S. at 181.

LOWD argue that the exact same showing was made in Methow Forest Watch v. United States Forest Service, 2005 WL 119590 (D. Or.), where Judge King held that the plaintiffs had met the standing requirements. The court disagrees. Based upon the representation of counsel at oral argument, the court understands that in Methow Forest Watch, the plaintiffs submitted affidavits stating that their individual recreational and aesthetic interests would be harmed. Here, the Coulter declaration fails to establish that individualized injury.

Much of Coulter's declaration is devoted to detailing her involvement in the administrative process leading up the Metolius Project EIS. LOWD does not explain to the court, or cite authority explaining, how involvement in the administrative process creates standing. LOWD may be attempting to make an argument for standing based on procedural rights. That argument fails, however, because standing based on procedural rights still requires injury in fact. Lujan, 504 U.S. at 573-74.

In Lujan, the plaintiffs argued, and the court of appeals held, that the plaintiffs had standing because they had suffered a "procedural injury." Id. at 571. The court of appeals relied upon a provision of the Endangered Species Act that granted a right to "any person" to challenge in federal court the Secretary of the Interior's failure to follow the ESA's consultative procedures. On review, the Supreme Court rejected that view and affirmed its earlier holdings that require a showing of injury in fact, even in cases involving procedural rights. Id. at 573-74. The court stated, "a  plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large

– does not state an Article III case or controversy." <u>Lujan</u>, 504 U.S. at 573-74. Here, Coulter's declaration does not explain how she will be harmed by the Metolius Project in a way that distinguishes her from the general public.

Because LOWD has failed to present evidence sufficient to establish that any of its members have suffered an injury in fact, LOWD's claim cannot be maintained. In the event that this ruling is reversed on appeal, I will address the merits of the case now.

**STANDARD OF REVIEW**

LOWD's claims under both NEPA and NFMA are reviewable under the APA. 5 U.S.C. §706(2)(A). <u>Forest Guardians v. U.S. Forest Service</u>, 329 F.3d 1089 (9th Cir. 2003). Where the court is conducting judicial review pursuant to the APA, summary judgment is the appropriate mechanism for determining the legal issue of whether the agency could reasonably have found the facts as it did. <u>Occidental Engineering Co. v. Immigration and Naturalization Service</u>, 753 F.2d 766, 770 (9th Cir. 1985).

The court reviews agency action to determine whether it is arbitrary and capricious and may not set the action aside unless there was no rational basis for it. <u>Northcoast Environmental Center v. Glickman</u>, 136 F.3d 660, 666 (9th Cir. 1998) (NEPA); <u>Oregon Natural Resources Council v. Lowe</u>, 109 F.3d 521, 526 (9th Cir. 1997) (NFMA). The arbitrary and capricious standard is appropriate for resolution of factual disputes implicating substantial agency expertise. <u>Ninilchik Traditional Council v. United States</u>, 227 F.3d 1186, 1194 (9th Cir. 2000). Review under the standard is narrow and the reviewing court may not substitute its judgment for that of the agency. <u>See</u> <u>United States Postal Service v. Gregory</u>, 122 S. Ct. 431, 434 (2001). The agency, however, must articulate a rational connection between the facts and law found and the

conclusions made.  See Midwater Trawlers Co-op v. Department of Commerce, 282 F.2d 710, 716 (9th Cir. 2002).  Thus, the reviewing court must determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Hells Canyon Alliance v. United States Forest Serv., 227 F.3d 1170, 1177 (9th Cir. 2000).  For example, the court may reverse if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise.  See Pacific Coast Fed. of Fishermen's Ass'n, Inc. v. National Marine Fisheries Serv., 265 F.3d 1028, 1034 (9th Cir. 2001).  Thus, the inquiry, though narrow, must be searching and careful.  Ninilchik, 227 F.3d at 1194.

"Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matter."  United States v. Alpine Land and Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989), cert. denied, 498 U.S. 817 (1990). Nevertheless, the "presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned."  Greenpeace v. NMFS, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).


Judicial review of an agency action is generally limited to the administrative record.[1] Friends of the Earth v. Hintz, 800 F.2d 822, 828 (9th Cir. 1986).

---

[1]On June 6, 2005, this court granted the Forest Service's motion to strike the declaration of George Badura and Exhibits A-C, and LOWD's motion to strike the declarations of  Terry Craigg and Rodney Jorgensen.

**FACTS**

On January 15, 2002, the Deschutes National Forest published a Notice of Intent to prepare an environmental impact statement "to evaluate options for addressing forest health concerns in the southern half of the Metolius Basin." AR 1444-1445. The Metolius Project area encompasses approximately 17,000 acres of Ponderosa Pine Forest, and is located on the Sisters Ranger District, approximately 15 miles northeast of Sisters, Oregon. AR 5568.

The Final EIS and ROD was issued on July 2, 2003. The ROD selected Alternative 3-Modified, which includes, *inter alia*, thinning/removing trees, mowing brush, prescribed burning, restoration of meadows and aspen stands, pruning trees infected with dwarf mistletoe, removal of hazzard trees, riparian area treatments, and the decommissioning of 60 miles of roads. AR 5577-5585.

Purpose of Metolius Project

The Metolius EIS provides that the "purpose and need" of the Metolius Project are to:

> (1) reduce the risk of catastrophic wildfire, insect and disease; (2) provide for the safety of people, and protect property, and tribal and natural resources; (3) restore late-successional (old growth) forest conditions; and (4) protect and restore watershed conditions.

AR 5570.

The Metolius Project resulted from Forest Service analysis indicating that the current conditions are outside the historic range of variability and unsustainable. On August 27, 1990, the Forest Service adopted the LRMP. AR 5640. The area of the Metolius Basin Project was originally allocated to the Metolius Conservation Area, and then, pursuant to an amendment to the LRMP in 1994, to the Late Successional Reserve and Riparian Area. AR 5640-5642.

In January 1996, the Metolius Watershed Analysis was completed. The Watershed

Analysis found that stand densities are higher than the site potential can support, the risk of tree mortality was increasing due to insect, disease, and fire, species composition is changing from early to late seral species, and stand structure is changing from larger trees to smaller trees and from single to multiple canopy layers. AR 127. The Metolius Project area lies within the Metolius Watershed.

On August 8, 1996, the Metolius Late Successional Reserve Assessment was completed. The Assessment concluded that maintaining manageable stand densities is essential for forest health and for maintaining or creating the large tree character and habitats in the dry forests of the Metolius Basin.

LOWD disagrees with the conclusions reached by the Watershed Analysis and the Late Successional Reserve Assessment, but agrees that portions of the Metolius Project area are at increased risk for fire.

2002 fires

During the summer of 2002, the Cache Mountain and Eyerly fires burned more than 27,000 acres, including 21,470 acres on the Sisters Ranger District. AR 2005; 2049. The two fires resulted in the degradation of 1,333 acres of nesting, roosting, and foraging habitat for spotted owls, 311 acres of which were in Critical Habitat Units, and caused other environmental impacts such as road construction, creation of fuel breaks, sedimentation, microclimate change, and reduction of canopy cover.

2003 fires

On July 5, 2003, the Link fire started and burned several miles to the west and south of the Metolius Project area. The fires burned a total of 3,594 acres. One month later, the Bear and

Booth fires (B&B fire) burned west of the Metolius Project area. The B&B fire burned a total of 91,915 acres, and overlapped the Metolius Project by 1,350 acres.

The Forest Service prepared analyses of the Link fire and the B&B fire, including the fires' effects on hydrology, soils, botany/noxious weed, transportation, heritage, and recreation. Emergency rehabilitation plans were designed and implemented in both fire areas.

Eyerly Fire Salvage Project

The Forest service has initiated a post-fire project called the Eyerly Fire Salvage Project. The ROD for that project was issued on August 2, 2004, 13 months after the Metolius ROD.

McCache Vegetation Management Project

In 2001 the Forest Service issued the McCache Vegetation Project. Pursuant to that project, the Forest Service conducted one timber sale of approximately 2 million board feet.

Updated Analyses

From December through March 2004, the Forest Service conducted an interdisciplinary analysis to update the 1996 Metolius Watershed Analysis to reflect changes that had occurred during the intervening eight years. In the spring of 2004, the Forest Service conducted an interdisciplinary analysis to specifically assess the effects of the Link and B&B fires. Based upon these additional analyses, the Forest Service determined that the changes to the Metolius Project area were not significant and that the EIS did not need to be revised or supplemented. However, because the B&B fire did affect some of the Metolius Project area, the Forest Service decided to drop 750 acres of proposed treatments and 170 acres of small tree thinning in spotted owl habitat.

**ANALYSIS**

I.        NEPA

NEPA requires federal agencies "to prepare an environmental impact statement (EIS) whenever they propose to undertake any "major Federal action[ ] significantly affecting the quality of the human environment." <u>Inland Empire Public Lands Council v. U.S. Forest Service</u>, 88 F.3d 754, 757-58 (9th Cir. 1996);  42 U.S.C. § 4332(2)©)). "The goal of NEPA is two-fold: (1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to a larger audience.  NEPA's goal is satisfied once this information is properly disclosed; thus, NEPA exists to ensure a process, not to ensure any result." <u>Id.</u> at 758. "[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." <u>Sierra Club v. Espy</u>,  38 F.3d 792, 796 (5th Cir. 1994).

A.        Purpose and Need

LOWD first challenges the EIS on the grounds that the Forest Service has failed to set forth and address science that contradicts the statement of purpose and need set forth in the Metolius Project.

An EIS should include a statement of purpose and need.  40 C.F.R. § 1502.10. "The statement must briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. The purpose and need then dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms. <u>City of Carmel-By-The-Sea v. U.S. Dept. of Transp.</u>, 123 F.3d 1142, 1155 (9th Cir. 1997) (citation omitted).  The court reviews  a purpose and need statement to determine whether it is reasonable. <u>Friends of Southeast's Future v.</u>

Morrison, 153 F.3d 1059, 1066-67 (9th Cir. 1998)   The Forest Service will be given "considerable discretion" to define the project's purpose and need. Id. at 1066.

Here, the Forest Service defined the purpose and need as follows:

> (1) reduce the risk of catastrophic wildfire, insect and disease;
> (2) provide for the safety of people, and protect property, and tribal and natural resources;
> (3) restore late-successional (old growth) forest conditions; and
> (4) protect and restore watershed conditions.

AR 5570.  That purpose and need is reasonable in light of the documented analysis leading up to the Metolius Project, including the Metolius Watershed Analysis and the Late Successional Reserve Assessment.

B.    Tree Removal

An EIS "must . . . disclose responsible scientific opinion in opposition to the proposed action, and make a good faith, reasoned response to it."  Seattle Audubon Soc. v. Lyons, 871 F. Supp. 1291, 1318 (W.D. Wash. 1994).   "Where the agency fails to acknowledge the opinions held by well respected scientists concerning the hazards of the proposed action, the EIS is fatally deficient." Friends of the Earth v. Hall 693 F. Supp. 904, 934 (W.D. Wash. 1988).

LOWD argues that the EIS fails to disclose or consider available science indicating that reducing stand density, and specifically logging large-diameter trees, does not reduce the threat and intensity of future fires.  In support of this argument, LOWD points to three pages of comments, submitted by LOWD during the administrative process.[2]  AR 3713-14, 3722.  The first two pages, AR 3713-14, consist of typewritten comments on the proposed alternatives.

---

[2]LOWD also cites to Exhibits A and B, which were filed with LOWD's Motion for Summary Judgment.  As noted in footnote 1, *supra*, the court struck those exhibits from the record.  Accordingly, the court will not address arguments relating to those two exhibits.

LOWD does not cite to any scientific studies or reports. In fact, it is not clear to the court that LOWD's comments constitute "opinions held by well respected scientists" such that the EIS is deficient for failing to address those comments directly.

The third page, AR 3722, contains three quotes, excerpted from articles or reports, and stating generally that large tree removal can exacerbate fire risk rather than improve it. The very concerns raised by that page, however, are addressed in the EIS. Specifically, the EIS acknowledge that "there is disagreement about the effectiveness of harvest in reducing fire hazzards," and then proceeds to lay out a reasoned response. AR 5864-66. The court is satisfied that the agency has addressed and responded to the issues raised by LOWD.

Finally, it is important to note that the removal of large-diameter trees serves to advance general forest health objectives, not just fire risk reduction. The ROD allows for removal of trees over 16 inches in diameter, under certain circumstances, to "help meet the purpose and need of the project by further reducing ladder fuels...;further reducing stand densities so that the remaining forest is at less risk from competition; further reducing pockets of moderate to highly infected larch dwarf mistletoe; and in general favoring the growth and survival of more healthy fire and drought resilient ponderosa pine, larch, and douglas fir." AR 5581-82.

C.    Cumulative impacts

LOWD argues that the EIS is deficient because it fails to include an analysis or consideration of cumulative impacts to wildlife species and soils resulting from the past, present, and reasonably foreseeable projects in the Metolius and adjacent fire areas. Specifically, LOWD points to the 2002 and 2003 wildfires, fire suppression and firefighting activities, and post-fire sales and expected sales, in McCache, Cache Mountain, Eyerly, and B&B Complex fires areas.

LOWD did not raise these issues during the public comment period. LOWD is therefore barred from litigating them now. Department of Transportation v. Public Citizen, 541 U.S. 752, 764 (2004).

"Persons challenging an agency's compliance with NEPA must 'structure their participation so that it ... alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration. Id. (citing Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553 (1978)). LOWD does not dispute the contention that it failed to raise the issue during the comment period, but cites to Public Citizen for the argument that the Forest Service's failure to address cumulative impacts was so obvious so that there was no need for LOWD to raise the issue in order to preserve its ability to challenge the EIS on that grounds. Id. at 765 ("Admittedly, the agency bears the primary responsibility to ensure that it complies with NEPA, and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action.") (internal citation omitted).

The flaw alleged by LOWD is not "obvious" such that LOWD should not be required to raise it during the comment period. The Forest Service did engage in cumulative effects analysis. LOWD argues that the analysis is inadequate. When the argument is one of degree, rather than an outright failure to address, the plaintiff must raise that argument during the comment period or be precluded from litigating it at a later date.

D.    One EIS

LOWD argues that the Forest Service violated NEPA because it did not analyze the

Metolius Project and B&B Complex, Link, Eyerly, Cache Mountain, and McCache post-fire projects in one EIS.

An agency is required to discuss two or more agency actions in a single EIS where the actions are "connected" or "cumulative" actions. 40 C.F.R. § 1508.25(a)(1), (2); <u>Klammath-Siskiyou Wildlands Center v. Bureau of Land Management</u>, 387 F.3d 989, 999 (9th Cir. 2004) (citing <u>Earth Island Institute v. United States Forest Serv.</u>, 351 F.3d 1291, 1306 (9th Cir. 2003)). "Where the proposed actions are 'similar,' the agency 'may wish' to assess them in the same document and 'should do so' when a single document provides 'the best way to assess adequately the combined impacts of similar actions....'" <u>Klammath-Siskiyou Wildlands Center</u>, 387 F.3d at 999 (quoting 40 C.F.R. § 1508.25(a)(3)).

    <u>(1)</u>    <u>Connected Actions</u>

NEPA regulations define connected actions as those actions which: "(I) Automatically trigger other actions which may require environmental impact statements. (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously. (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1); <u>Northwest Resource Information Center, Inc. v. National Marine Fisheries Service</u>, 56 F.3d 1060, 1067-68 (9th Cir. 1995). The Ninth Circuit determines whether actions are connected by applying an "independent utility" test: If the projects "would have taken place with or without the other, each has 'independent utility' and the [projects] are not considered connected actions." <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 894 (9th Cir. 2002).

LOWD argues that the Metolius Project and the other post-fire projects are connected because they are adjacent in location and overlap in time, and because each of the projects will

involve maintenance, including the application of potentially harmful herbicides to maintain the fuel breaks.  While a common sense reading of "connected" would include time and place, the Ninth Circuit requires more.  The court must consider whether the projects would have taken place with or without the other.  <u>Dombeck</u>, 304 F.3d at 894.  The Forest Service argues that the projects are individually tailored to respond to the needs of the specific fire areas, and the implementation of one project does not depend upon the implementation of the other projects. The court agrees that the record supports a determination that the various projects had "independent utility" and, therefore, are not connected actions. The Forest Service's decision to treat the projects under separate EIS documents was not arbitrary.

<u>(2)</u>     <u>Cumulative Actions</u>

"Cumulative actions" are actions "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2); <u>Thomas v. Peterson</u>, 753 F.2d 754, 759 (9th Cir. 1985). Here, LOWD argues that the projects are cumulative because they all involve logging projects as part of a recovery strategy and they are all located in the Sisters Ranger District of the Deschutes National Forest.

In <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d 1208 (9th Cir. 1998), the court required the Forest Service to prepare a single EIS for five potential logging projects because the individual projects  formed part of a single timber salvage project, the projects were announced simultaneously, the projects were reasonably foreseeable, and the projects were located in the same watershed. <u>Id.</u> at 1214-15.  In <u>Earth Island Institute</u>, on the other hand, the court held that the Forest Service did not act arbitrarily in deciding not to prepare a single EIS where many of the factors relied upon in <u>Blackwood</u> were missing.  351 F.3d at 1305.

Specifically, in Earth Island Institute, the boundary between sale areas predated the agency decision, the sales and analyses proceeded on separate time schedules, and nothing in the record suggested that the agency intentionally segmented review in order to minimize cumulative impact analysis. Id. The court also found that the EIS explicitly discussed the cumulative impact of many elements of the other projects. Id.

Here, the Forest Service argues that the projects were proposed at various times, they proceeded on their own time schedules, the project boundaries do not overlap, and the effects of the other projects were discussed in the Metolius Project EIS. As in Earth Island Institute, this court cannot say that the Forest Service acted arbitrarily under this circuit's case law in determining that the Metolius Project and the 2002 and 2003 post-fire projects did not need to be analyzed in a single EIS.[3]

(3)    Similar Actions

"Similar actions" are actions "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25. An agency should be accorded more deference in deciding whether to analyze similar actions in a single EIS. Earth Island Institute, 351 F.3d at 1306.

LOWD argues that the projects are similar in two respects. First, they are located in the

---

[3] An argument can be made that, because the fires burned in 2002 and 2003, the post-fire recovery projects were reasonably foreseeable while the Metolius EIS was being developed. In Blackwood, however, the projects were developed as part of one large scheme. Here, the Forest Service was responding to individual fires. The timing of the Metolius Project in relation to the other projects appears to be merely coincidentally.

same geographical area. Each of the projects is located in the Sisters Ranger District, and each of the projects is within or adjacent to the Metolius Watershed. Second, the timing of the projects is similar. Logging in the Metolius project began in 2004, and LOWD anticipates that logging in the other projects will begin soon.

The Forest Service argues that the only similarity is geography. The Forest Service points out that the 2002 and 2003 post-fire projects are the result of unplanned wildfires, and that any similarity in timing is mere happenstance.

In light of the deference that is to be accorded agency decisions with regard to similar actions, the court determines that the Forest Service did not act arbitrarily in deciding not to address the Metolius Project and the 2002 and 2003 post-fire projects in a single EIS.

E.      Supplemental EIS

LOWD argues that the Forest Service violated NEPA by failing to prepare a supplemental EIS addressing the impacts of the 2003 B&B and Link fires.

The court reviews an agency's decision whether to prepare a supplemental EIS under a "rule of reason." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373-74 (1989). "An agency need not supplement an EIS every time new information comes to light," but the agency must take a "hard look at the environmental effects of their planned action." Id.

The undisputed facts show that the Forest Service did examine the effects of those fires on the resources within the fire areas and on the Metolius Project. Specifically, the Forest Service prepared analyses of the effects of the fire on hydrology, soils, botany, transportation, heritage, and recreation. Suppression and Rehabilitation plans were developed and implemented for both fire areas. The Forest Service reviewed the analyses and determined that the changes to

the Metolius Project were not significant and, therefore, a supplemental EIS was not necessary. The review was then submitted to the public for comment. Only two comments were received; LOWD did not submit comments. LOWD disputes the adequacy of the Forest Service's review, but the court finds that the Forest Service took the requisite hard look and, therefore, defers to the agency's "technical expertise." <u>Marsh</u>, 490 U.S. at 377.

F.      Soils

LOWD argues that the EIS violates NEPA because the Forest Service fails to adequately analyze and disclose the direct impact to soils likely to result from the Metolius Project. A review of the EIS, however, shows that the Forest Service gave the issue of soil impact the requisite hard look.

Soil was identified in the EIS as a "key issue." The EIS discloses and discusses current soil conditions in areas where timber harvest activities are proposed. The EIS states that existing soil conditions were determined based on "past harvest history, field observations, research references, and personal communications with timber sale administrators." AR 5811. Further, "[a]dditional field investigations were conducted after snow melt to estimate the percentages of existing soil conditions in proposed activity areas." AR 5811. The EIS also includes a detailed discussion regarding the possible, or predicted, impact that the Metolius Project will have on soils. The court is satisfied that the Forest Service has met its obligation under NEPA.

LOWD also argues that the Forest Service failed to identify scientific support for its conclusion that subsoiling will effectively rehabilitate compacted soils. The Forest Service points out that the EIS states, "In the past decade, subsoiling has been used on the forest to reduce the amount of compacted soil and improve soil conditions in activity areas." The EIS

cites to a report by Terry Craigg, a soil scientist with the Forest Service. In that report, Craigg discusses the use of subsoiling in the Deschutes National Forest and concludes that subsoiling can create the conditions that allow soil to recover over time.

Finally, LOWD argues that the EIS is inadequate because it fails to examine the "conflicting science" regarding the effects of (1) the logging proposal on soils in the project area, and (2) subsoiling. In support of that argument, LOWD relies on the Declaration of George Badura and The Chewaucan Report, which was submitted as LOWD's Exhibit C. Both of these documents were stricken from the record on the grounds that review of agency action is limited to the administrative record.

Once the court is satisfied that the agency has taken a hard look at the issues and responded to reasonable opposing viewpoints, the agency is entitled to wide discretion in assessing the scientific evidence. Earth Island Institute, 351 F.3d at 1300. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive." Marsh, 490 U.S. at 378. The court must, however, review the record to determine whether the agency has made a reasoned decision based on its evaluation of the evidence. Id.

Based on the record before the court, I am satisfied that the Forest Service has met its NEPA obligations by taking a hard look at the impact of the Metolius Project on soils and on the efficacy of subsoiling, and that the conclusions reached by the Forest Service regarding the efficacy of subsoiling are reasonable. The court will therefore defer to the Forest Service's expertise.

G. failure to analyze impact on wildlife

In its Memorandum in Support of Motion for Summary Judgment, LOWD argues that the Forest Service violated NEPA by failing to provide information on the cumulative impacts of the project on the management indicator species.[4] LOWD does not, however, raise this claim in its Complaint. At oral argument, LOWD asserted that it was seeking relief for failure to analyze impact to management indicator species under both NEPA and NFMA. The court could bar LOWD's claim under NEPA for failure to properly raise the issue. However, following the example of the parties, who have briefed the issue, the court will address the merits of the claim.

The EIS identifies management indicator species that have a known presence of potential habitat within the Metolius Project area and described the habitat used by each of those species. The EIS then analyzes the direct and indirect effects of the Metolius Project on those species and their habitat. The court finds that the Forest Service has met its obligation under NEPA.

II.    NFMA

NFMA creates a statutory framework for the management of our national forests, and involves two levels of forest planning. Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1376 (9th Cir. 1998). At the first level, NFMA requires the Forest Service to create a comprehensive forest plan, called a Land Resource Management Plan, for each national

---

[4]On the Deschutes National Forest, certain species, including the northern spotted owl and the northern goshawk are designated as management indicator species. A management indicator species is used as a bellwether, or a representative, for the other species that share the same special habitat needs or population characteristics. Inland Empire Public Lands Council v. U.S. Forest Service, 88 F.3d 754, 762 (9th Cir. 1996). The Forest Service analyzes the impact of a proposed agency action on the management indicator species in order to estimate the effects of proposed management activities on fish and wildlife populations. Id. The use of management indicator species allows the Forest Service to thoroughly evaluate the effects of the alternatives on fish and wildlife populations without having to evaluate each species individually. Id.

forest.  The Lands Council v. Powell, 395 F.3d 1019, 1032-33 (9th Cir. 2005).  The LRMP

establishes basic guidelines and sets forth the planning elements that will be employed by the

Forest Service in future actions in that forest.  Sierra Club v. Robertson, 28 F.3d 753, 755 (8th

Cir. 1994).  The second level involves implementation of the LRMP through site-specific

projects.  Neighbors of Cuddy Mountain, 137 F.3d at 1376.  NFMA requires that all site-specific

projects must be consistent with the level one LRMP.  16 U.S.C. § 1604(I); The Lands Council,

395 F.3d at 1033.

NFMA also imposes substantive requirements on the Forest Service, such as the duty "to

provide diversity of plant and animal communities."  16 U.S.C. § 1604(g)(3)(B); Neighbors of

Cuddy Mountain, 137 F.3d at 1376.

LOWD makes two arguments based on NFMA.  First, LOWD argues that the EIS fails to

ensure the viability of management indicator species.  Second, LOWD argues that the EIS does

not adequately address or comply with the detrimental soil condition standards set forth in the

LRMP.

A.      Wildlife

LOWD alleges in its complaint that the Forest Service violated NFMA by failing to

provide for the viability of management indicator species.  As an initial matter, the Forest

Service argues that LOWD did not raise this issue during the comment period or include the

issue in its opening brief and, therefore, is barred from litigating the issue here.

The court finds that LOWD raised the issue during the comment period by expressing

concern over the impact of the proposed alternatives on the habitat of several management

indicator species, including the Northern Spotted Owl. While LOWD did not refer to NFMA or use the term management indicator species, that type of specificity is not required. By stating concern that the proposal did not provide sufficient habitat for the Northern Spotted Owl, LOWD gave the Forest Service the opportunity to reevaluate its compliance with the substantive requirements of NFMA.

The court also finds that LOWD adequately briefed the issues in this motion. Admittedly, the argument was not clearly identified, and was included in the section of LOWD's brief dealing with NEPA violations. Nonetheless, the argument identified NFMA as source of statutory authority and stated that the EIS did not disclose the possible impact of the logging proposal on the management indicator species or evaluate the alternatives in terms of their impact on habitat and population of management indicator species.

Finally, addressing the merits of LOWD's claim, LOWD argues that defendants violated NFMA by failing to monitor management indicator species populations. LOWD argues that monitoring is required under the NFMA regulations enacted in 1982. The Forest Service argues that the EIS is governed by the 2005 regulations, which do not require population monitoring. In the alternative, the Forest Service argues that it has complied with the 1982 regulations, as interpreted by the Ninth Circuit, by analyzing and providing sufficient habitat for management indicator species.

As noted above, NFMA imposes substantive duties on the Forest Service, including the duty to provide for diversity of plant and animal communities. 16 U.S.C. §1604(g)(3)(B). Under regulations enacted in 1982, the Forest Service was required to identify and select management indicator species as part of its method for managing habitat to maintain viable

species populations. The regulations stated, "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined," § 219.19(a)(6)(1982). In 2000, the Department of Agriculture replaced the 1982 regulations with new regulations. 65 Fed. Reg. 67514 (Nov. 9, 2000). The regulations consisted of substantive regulations and a transition provision. 65 Fed. Reg. at 67579; 36 C.F.R. § 219.35 (2000). A few months later, the Department of Agriculture determined that the Forest Service was not sufficiently prepared to implement the 2000 regulations, and the transition period was extended. 66 Fed. Reg. 27552 (May 17, 2001). The transition period was extended again in 2002 and in 2003. 67 Fed. Reg. 35431 (May 20, 2002); 68 Fed. Reg. 53294 (Sept. 10, 2003).

In 2004, the Department of Agriculture issued an interpretive rule to clarify the effect of the 2000 transition provisions. 69 Fed. Reg. 58055 (Sept. 20, 2004). The Interpretive Rule states that the 1982 regulations are no longer in effect, and that the 2000 transfer provision, 36 C.F.R. 219.35, was the only applicable law after January 9, 2000:

> The transition provisions as originally enacted, and now twice amended, explicitly refer to the 1982 planning rule as the rule "in effect prior to November 9, 2000." At the same time, given the extension of the effective date of paragraph (d), within which site-specific decisions must comply with the 2000 planning rule (68 FR 53294), it is clear that site-specific decisions entered into during the transition period are not to comply with the substantive provisions of the 2000 planning rule. This interpretative rule clarifies that until a new final rule is promulgated, the transition provisions of the 2000 planning rule, as amended by the May 2002 interim final rule remain in effect, including the requirement of § 219.35 paragraph (a) of the transition provisions that responsible officials consider the best available science in implementing national forest land management plans and, as appropriate, plan amendments. Pursuant to paragraph (b), the provisions of the 1982 planning rule may continue to be used only for plan amendments and revisions upon election of the responsible official. Appropriate

plan amendments and projects proposed during the transition
period should be developed considering the best available science
in accordance with § 219.35 paragraph (a).

69 Fed. Reg. at 58056.

In January 2005, the Department of Agriculture replaced the 2000 regulations and

terminated the 2000 transition provision. 70 Fed. Reg. 1022 (Jan. 5, 2005); 70 Fed. Reg. 1023

(Jan. 5, 2005). The 2005 regulations provide:

Management indicator species. For Units with plans developed,
amended, or revised using the provisions of the planning rule in
effect prior to November 2, 2000, the Responsible Official may
comply with any obligations relating to management indicator
species by considering data and analysis relating to habitat unless
the plan specifically requires population monitoring or population
surveys for the species. Site-specific monitoring or surveying of a
proposed project or activity area is not required, but may be
conducted at the discretion of the Responsible Official.

36 C.F.R. §219.14(f).

Plaintiff argues that the Forest Service was required to comply with the 1982 regulations,

and points to Utah Environmental Congress v. Bosworth, 372 F.3d 1219, 1221 (10th Cir. 2004)

for authority. This authority is not helpful to plaintiff's case. In Utah Environmental Congress,

the court did apply the 1982 regulations. However, the court acknowledged in a footnote that

while the regulations were changed in 2000, the disputed Forest Service action occurred prior to

November 9, 2000, the effective date of the 2000 regulations. Id. at 1221 n. 1. Here, the Forest

Service issued the Final EIS and ROD for the Metolius Project on July 2, 2003, well after the

effective date of the 2000 regulations.

Defendant argues that the 2005 regulations should be applied retroactively. However,

because the court is reviewing this case under the APA and, therefore, determining whether the Forest Service acted in an arbitrary or capricious manner in implementing the law in effect at that time, I hold that the applicable regulation is the 2000 transfer regulation, 365 C.F.R. §219.35.[5]  Accordingly, if the Forest Service followed the best available science in a manner consistent with the Deschutes LRMP, then the Forest Service has complied with its NFMA obligations.  Utah Environmental Congress v. Bosworth, 370 F. Supp. 2d 1157, 1169 (D. Utah 2005).  The court has received no evidence showing that the EIS does not comply with LRMP requirements relating to management indicator species.

Even if the 1982 regulations did apply to this case, summary judgment would still be appropriate because the Forest Service complied with its NFMA obligations by analyzing and providing sufficient habitat for management indicator species.  Inland Empire Public Lands Council v. United States Forest Service, 88 F.3d 754 (9th Cir. 1996)

In Inland Empire Public Lands Council, the court applied the 1982 NFMA regulations and held that the agency complied with NFMA by evaluating habitat as a proxy for monitoring population trends.  Id. at 761. The court addressed the question again in Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957 (9th Cir. 2002).  There, the court held that the use of habitat as a proxy for actual monitoring was arbitrary and capricious.  Id. at 972-73.  The court did not disavow the holding in Inland Empire Public Lands Council, but distinguished the two cases based on the quality of methodology utilized in the habitat analysis.  Id.  In the Ninth

---

[5] The court recognizes that in a recent Findings and Recommendation, Magistrate Judge Jelderks of the District Court of Oregon determined that the 2005 regulations should be retroactively applied to an EIS issued on July 2, 2004.  See Cascadia Wildlands, et al. v. United States Forest Service, et al., D. Or. Civil No. 05-76-JE.

Circuit, therefore, habitat analysis as a proxy for monitoring population trends is sufficient under the 1982 regulations where the methodology utilized by the Forest Service is sound.  Inland Empire Public Lands Council, 88 F.3d at 761.

Here, LOWD argues that the Forest Service's methodology in analyzing habitat was not sound.  Specifically, LOWD argues that the Forest Service improperly relied on a database called DecAID in determining habitat.[6]  The Forest Service points out that LOWD did not raise concerns with DecAID in its comments on the EIS, in its administrative appeal, in its complaint, or in its prior briefings on this case.  The court agrees, and holds that LOWD is precluded from raising that issue now.[7]  Public Citizen, 541 U.S. at 764.

The Metolius Project EIS contains a reasonably thorough discussion and analysis of habitat for management indicator species within the project area, and concludes that the Metolius Project ensures the viability of the management indicator species.  The court is satisfied that the Forest Service has not acted in an arbitrary or capricious manner, and therefore defers to the agency's technical expertise.

B.      Soil

LOWD first argues that the EIS violates NFMA because it does not adequately disclose

---

[6] DecAID is an advisory tool to help land managers evaluate the effects of forest conditions and management activities on organisms that use snags, down wood, or other wood decay elements.

[7] Even if LOWD was not so precluded, LOWD's argument still fails.  LOWD cites two cases where the court held that reliance on DecAID was arbitrary and capricious.  Those cases are distinguishable from the present case on the grounds that they involved post-fire projects, and the Metolius Project is not a post-fire project.  In addition, the Forest Service did not rely solely on DecAID for its habitat analysis.  Rather, DecAID was one of many tools that were used to analyze habitat.

and address the applicable LRMP standards with regard to soils. The court disagrees. As noted above, soil is identified as a "key issue" in the EIS. The LRMP standards are identified and discussed in the EIS. The EIS also contains information on current soil conditions and post-project soil conditions.

Next, LOWD argues that the Metolius Project will violate LRMP standards, and relies upon data set forth in table 4-30 of the EIS for after-treatment detrimental soil conditions.

The LRMP soil standards require that the Forest Service "[l]eave a minimum of 80 percent of an activity area in a condition of acceptable productivity for trees and other managed vegetation following land management activities." LRMP SL-3. "Any site where this direction cannot be met will require rehabilitation." LRMP SL-4. Rehabilitation measures may include tillage. LRMP SL-4. Tillage is another name for subsoiling. The Forest Service Manual provides further guidance regarding compliance with the LRMP in areas where the soil condition exceeded the 20 percent mark prior to project implementation:

> "In activity areas where more than 20 percent detrimental soil conditions exist from prior activities, the cumulative detrimental effects from project implementation and restoration must, at a minimum, not exceed the conditions prior to the planned activity and should move toward a net improvement in soil quality."

Table 4-30 clearly sets forth that after treatment *and* restoration, the Metolius Project will comply with LRMP soil standards. Accordingly, the Forest Service has complied with the LRMP, and thus with NFMA.

Further, as noted above, the EIS cites to the report by soil scientist Terry Craigg to support the conclusion in the that subsoiling will effectively rehabilitate impacted soils. Because

the Forest Service has identified scientific support and articulate a rational connection between the facts found and the conclusions made, the court cannot say that the Forest Service has acted in an arbitrary or capricious manner. <u>Oregon Natural Resources Council v. Lowe</u> 109 F.3d 521, 526 (9th Cir. 1997).

Finally, LOWD makes the argument that it is questionable whether subsoiling will actually be implemented. The ROD, however, clearly states that the mitigation measures set

forth in the EIS, which includes subsoiling, will be implemented. The court will not assume that the Forest Service will ignore the ROD.

**CONCLUSION**

For the foregoing reasons, plaintiff's Motion for Summary Judgment and Injunctive Relief (No. 35) is DENIED, and defendants' Motion for Summary Judgment (No. 51) is GRANTED.

Dated this 27th day of July, 2005.

 /s/ Donald C. Ashmanskas

Honorable Donald C. Ashmanskas

U.S. Magistrate Judge